**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

**EVELYN TELLER, the Mother of Decedent
Timmy Teller, and ELAINE TELLER,
individually, and as Personal Representative
of the Estate of Timmy Teller, Deceased,**

      **Plaintiffs,**

      **vs.**                         **No. _____**

**THE UNITED STATES OF AMERICA,**

      **Defendant.**

## COMPLAINT UNDER THE FEDERAL TORT CLAIMS ACT FOR WRONGFUL DEATH DUE TO MEDICAL NEGLIGENCE

Plaintiff, Elaine Teller, avers for her complaint the following:

1.     Plaintiff Evelyn Y. Teller is the mother of the decedent. She resides on the Navajo Indian Reservation in Chinle, Arizona.

2.     Plaintiff Elaine Teller, is a resident of Chinle, Arizona and serves in this wrongful death action both in the capacity of personal representative of the Estate of Timmy Teller, and as a potential wrongful death beneficiary. She is a sister of the decedent. She was designated as the personal representative of the estate of Timmy Teller by the Navajo Nation courts on April 21, 2015, (Exhibit 1)

3.     Although not listed separately as plaintiffs, other potential wrongful death beneficiaries are:

a.     Cornelia Chee is a sister of the decedent.

b.     Cynthia Grayson is a sister of the decedent.

c.     Francis Teller is a brother of the decedent.

d.     Stella Begay is a sister of the decedent.

1

e.      Margaret Fulton is a sister of the decedent.

f.      Catherine Rubio is a sister of the decedent.

g.      Pete Teller is a brother of the decedent.

h.      Anita Teller is a sister of the decedent.

2.      Plaintiff brings this civil action for compensatory damages arising from the negligence of employees/personnel at the Chinle Comprehensive Health Care Facility ("CHINLE") located in Chinle, Arizona, a facility operated by the United States through the Department of Health and Human Services and the Indian Health Service.

**JURISDICTION AND VENUE UNDER THE FEDERAL TORT CLAIMS ACT**

3.      Plaintiff's claims in this action are authorized by and are brought pursuant to the provisions of the Federal Tort Claims Act (FTCA), 28 U.S.C. §1346(b) and 28 U.S.C. §2671, *et seq.,* and also pursuant to 28 U.S.C. §1331.

4.      Federal statutes, including the FTCA, vest this court with exclusive jurisdiction over plaintiff's claims in this case.

5.      The FTCA makes the United States liable for the negligent acts and omissions of federal "employees."

6.      Federal employees include, but are not limited to, employees of the Indian Health Service and the Chinle Comprehensive Health Care Facility.

7.      At all times material to this case defendant United States controlled, owned, and operated CHINLE.

8.      CHINLE provides medical care to Native Americans who are members of recognized tribes pursuant to various federal statutes and other law.

9.      At all times material to this case defendant United States, acting through the Indian Health Service, held itself out to have the ability to provide medical care to

2

members of the Navajo Nation and plaintiff, at its Chinle hospital, including the ability to address decedent's chronic health problems, including his cardiac condition.

10.     Plaintiffs, through legal counsel, presented to the Department of Health and Human Services in May, 2015, a timely administrative claim under the FTCA alleging negligence by federal employees at CHINLE in the provision of medical care to decedent. (Exhibit 2).

11.     Defendant has had more than six months to investigate plaintiff's claim and to attempt settlement with plaintiff.

12.     By law, a claim presented under the FTCA is deemed denied by the United States six months after it is presented, and a plaintiff is then authorized to file a lawsuit against the United States.

13.     Despite plaintiff providing defendant with all documentation requested, (Exhibit 3), defendant has not attempted to settle with plaintiff and has not denied her claim.

14.     Plaintiff has now exhausted her administrative remedies as required by the FTCA.

15.     Plaintiff is authorized by statute to file this action in the United States District Court for the District of Arizona.

16.     Plaintiff is a tribal member of the Navajo Nation.  At all material times, decedent was also a tribal member of the Navajo Nation.  Both plaintiff and decedent resided in or near Chinle, Arizona.

17.     Venue is proper in this district under 28 U.S.C. §1402(b).

## FACTUAL BACKGROUND

18.     Decedent Timmy Teller's significant, preexisting medical conditions were Down's Syndrome and rheumatic valvular heart disease with murmur.  Due to his heart disease and the chronic heart murmur related to the heart disease, he was maintained prophylactically with regular administration of the antibiotic Erythromycin 250 mg by mouth, twice a day for subacute endocarditis ("SBE").  His medical history was well known to personnel at the Chinle Comprehensive Health Care Facility.

19.     On August 22, 2013, Timmy underwent a routine dental procedure of cleaning and fillings.  He was prescribed 600 mg of Clindamycin for additional SBE prophylaxis and he was also prescribed Lorazepam 3 mg for anxiety related to the dental procedure.

20.     On October 4, 2013, approximately 6 weeks and 1 day after the dental procedure, Timmy was brought to the CHINLE emergency room with complaints of fever and coughing for 3 weeks. He was seen by Timothy Obernuefemann, M.D.  During this visit, his vital signs were recorded at:  temperature 97.2, respiratory rate 36, pulse 120, blood pressure 129/54, oxygen saturations at 95% on room air, and a pain level of 3/10.    Timmy's physical examination was limited.  No labs were drawn, no cultures were drawn, and there was no differential diagnose made, offered despite Timmy's preexisting heart murmur, SBE, and exhibiting 2 of 4 diagnostic criteria for systemic inflammatory respiratory syndrome ("SIRS").  Timmy was diagnosed with bronchitis and an upper respiratory infection and was told to take Claritin.

21.     On October 5, 2013, Timmy returned to the CHINLE emergency room, 6 weeks and 2 days after the dental procedure, with continued coughing and fever. He was seen by Timothy Obernuefemann, M.D. His vital signs were recorded at: temperature

98.0, respiratory rate 20, pulse 116, blood pressure 127/57, oxygen saturations at 95% on room air, and a pain level of 5/10. Timmy's physical examination was limited and his heart was not auscultated, despite his preexisting condition. Routine labs were ordered, but no cultures were ordered. During the blood draw for the labs, hemolysis of the blood sample occurred during the blood draw. The blood draw was not repeated despite its improper collection. No urinalysis was ordered. Timmy was diagnosed with Bronchitis. He was prescribed Bactrim DS, Tylenol, Ibuprofen, and Zyrtec.

22.    On October 9, 2013, Timmy returned to the CHINLE Medicine Outpatient Clinic, 6 weeks and 6 days after the dental procedure with a continuation of his cough, nasal congestion, and low grade fever. He was seen by Eric Ritchie, M.D. His vital signs were recorded at:   pulse 118, blood pressure 150/64, respiratory rate 20, oxygen saturation 96%, pain 0/10. The prior prescription of Bactrim DS was stopped due to twitching. No labs were drawn. No cultures were drawn. There was no differential diagnosis developed despite Timmy's preexisting heart murmur, SBE, and again exhibiting 2 of 4 diagnostic criteria for SIRS. Timmy was diagnosed with a cough and hypertension "due to anxiety."

23.    On November 6, 2013, Timmy returned to the CHINLE Medicine Outpatient Clinic, 10 weeks, 6 days post dental procedure for laboratory results, complaints of difficulty walking on his right leg, and fever. He was seen by Eric Ritchie, M.D. His vital signs were recorded at:   temperature 98.1, pulse 118, blood pressure 124/67, respiratory rate 20, pain 6/10. Labs were drawn and reviewed. Significant laboratory results were:  SED rate high at 54, CRP[1] high at 76.4, and urine had large red

---

[1] SED and CRP rates are inflammatory markers.

blood cells. No blood cultures were drawn. Throat culture was negative. Physical examination of the heart indicated a "regular rate, no murmur appreciated."

24. Dr. Ritchie noted elevated serum markers for inflammation (SED and CRP) and blood and protein in Timmy's urine, but suspected a viral illness with a possible component of reactive arthritis. It was noted that the administration of Ibuprofen in the clinic resolved the low grade temperature, but there was no repeat temperature taken to verify the accuracy of this. Additionally, it was noted that the administration of Ibuprofen showed "...improvement in HR to 119" yet Timmy's heart rate upon presentation was 118. Timmy was discharged with instruction to take Ibuprofen as needed for pain, return in one week for a repeat urinalysis and BMP[2], and if the symptoms persisted, consider CT imaging of the kidneys and/or a nephrology referral.

25. On November 12, 2013, Timmy returned to the CHINLE Medicine Outpatient Clinic, 11 weeks, 5 days post dental procedure for laboratory results and right leg pain. He was seen by Eric Ritchie, M.D. His vital signs were recorded at: temperature 97.8, pulse 113, blood pressure 101/46, respiratory rate 22, oxygen saturation 96%, pain 2/10. A physical examination was completed, but did not include examination of Timmy's heart, lungs, or abdomen. Timmy's labs slightly improved with a decline in his CRP from 72 to 67 and moderate vs. large blood cells in his urine. No blood cultures were drawn. Dr. Ritchie diagnosed Timmy with right lower extremity pain and cerumen impaction. He only treated Timmy for cerumen impaction in his ear during this visit.

---

[2] BMP - basic metabolic profile laboratory testing.

26.     On November 14, 2013, Timmy returned to the CHINLE Medicine Outpatient Clinic, 12 weeks post dental procedure.  The time was 21:47 (9:47 p.m.).  His vital signs were recorded at:  temperature 101.6, pulse 132, respiratory rate 32, oxygen saturation 92%, pain 4/10.  Timmy was visibly shaking.  He was referred to the CHINLE Emergency Room.

27.     On November 15, 2013, at 01:20 a.m. (3 hours, 33 minutes after presenting to the Medicine Outpatient Clinic), Timmy was seen at the CHINLE emergency room by Dr. Antonio Duran, 12 weeks, 1 day post dental procedure, upon referral from the CHINLE Medicine Outpatient Clinic.  His vital signs were recorded at: temperature 96.5, pulse 132, respiratory rate 22, blood pressure 133/57.  They were re-recorded again at: pulse 115, respiratory rate 20, and re-recorded a third time at: pulse 100-101, respiratory rate 18-20, blood pressure 118/62, blood pressure 126/59.     The purpose of the ER visit was documented as UTI and dehydration.  Urinalysis indicated moderate blood in the urine with large red blood cells.  Routine labs were drawn including cultures.   Despite Timmy's complaints of fever, cough, and chills and the notation of "Pt shaking" from the CHINLE Medicine Outpatient Clinic triage report, Dr. Duran noted that the patient is in "no apparent distress" with "normal [breathing] without complaint."

28.     Dr. Duran prescribed Keflex 500 mg three times per day for 10 days and Cipro 500 mg twice a day for 10 days with discharge instructions to follow up in the Clinic on Monday, November 18, 2013.  The medical records do not indicate a final diagnosis.

29.     On November 15, 2013, at 09:35, a pharmacy note indicates the Cipro that Dr. Duran prescribed can cause QT-prolongation and this medication was changed to

cephalexin 500 mg three times a day for 10 days.  This pharmaceutical note indicates that Timmy was treated in the emergency room for a UTI (urinary tract infection).

30.    On November 16, 2013, the blood cultures that were drawn during Timmy's CHINLE emergency room visit on November 15, 2013, came back 4/4 positive for streptococcus anginosus (gram positive cocci in chains).  Streptococcus anginosus is resistant to Clindamycin and Erythromycin.  The laboratory notified registered nurse Lisa Tidwell Davis in the CHINLE emergency room of the positive results on November 16, 2013, at 05:10 a.m.

31.    On November 18, 2013, at 10:29 a.m., 12 weeks, 4 days post dental procedure, Timmy was brought into the CHINLE emergency room after his family was called just that morning regarding the positive blood culture results.  He presented with fever, chills,  extreme weakness and  required assistance to walk.  During this visit, Dr. Ritchie diagnosed Timmy with bacteremia (the presence of bacteria in the blood) and was concerned for subacute bacterial endocarditis with 4/4 positive blood cultures in his patient with known rheumatic heart disease and no other source of infection apparent upon examination.  Timmy was transferred to the Flagstaff Medical Center.

32.    Timmy was admitted to the Flagstaff Medical Center on November 18, 2013, and discharged on December 19, 2013, to Select Specialty Hospital in Phoenix, a long time acute care facility.

33.    At discharge from the Flagstaff Medical Center, Timmy  was diagnosed with and/or had experienced, at minimum, the following:

a.    Streptococcal anginosus aortic valvular endocarditis, most likely secondary to recent dental work.
b.    Decreased level of consciousness with roving gaze and left hemiparesis secondary to documented multifocal embolic CVAs secondary to embolization of the moderately large mobile aortic

8

valvule vegetation.  This is complicated by mild hemorrhagic conversion.

c.    Chronic and persistent severe aortic insufficiency with low diastolic blood pressures.

d.    Upper GI bleed.

34.    On December 19, 2013, Timmy was admitted to Select Specialty Hospital. When it was realized that Timmy's condition was terminal, mechanical ventilation was removed on January 7, 2014.

35.    On January 8, 2014, Timmy died.  The causes of death were:

a.    Respiratory failure.

b.    Multifocal strokes.

c.    Multiple septic emboli.

d.    Infective endocarditis - streptococcus anginosus secondary to unknown dental procedure.


## CAUSE OF ACTION - DUTY, NEGLIGENCE, AND CAUSATION

36.    Plaintiff repeats the averments stated in the preceding paragraphs and incorporates them by reference as part of the first count of negligence.

37.    The United States is legally responsible for the negligent actions of its CHINLE staff, including employees of CHINLE, while those employees are performing job duties for the employer or engaged in furtherance of the interests of the employer.

38.    The involved staff who participated in the medical care of decedent at CHINLE were employees of the Indian Health Service at all pertinent times of Timmy Teller's health care.

39.    Those employees were on the job performing job-related duties for CHINLE at the time they acted negligently.

40.    If any negligent CHINLE staff were not actual employees of the Indian Health Service at the time of the incident, they may have been contract employees

whose contracts with the defendant provide that the defendant is liable under the Federal Tort Claims Act for their negligence.

41.     If any negligent CHINLE staff were not actual employees of the Indian Health Service at the time of the incident, they may have been contract employees whose contracts with the defendant may be deemed by statute or federal regulation to make the defendant liable under the Federal Tort Claims Act for their negligence.

42.     If any negligent CHINLE staff were not actual employees of the Indian Health Service at the time of the incident, and the preceding paragraphs 40-41 do not apply, they may have been contract employees for whom the defendant is vicariously liable under the Federal Tort Claims Act pursuant to doctrines of law such as agency and *respondeat superior*.

43.     Defendant had a duty to exercise reasonable care in the diagnosis and treatment of Timmy Teller, and to possess and use the degree of skill and learning ordinarily used in the same or similar circumstances by members of their professions in the provision of healthcare.

44.     The involved staff breached the duty of reasonable care that was owed to Timmy Teller and are guilty of the following negligent actions and omissions by failing to measure up to the applicable standards of care, skill, and practice required of members of their profession, to wit:

a.     failure to provide differential diagnoses during multiple visits;

b.     failure to draw blood cultures  on 5 separate visits;

c.     failure to re-draw blood samples post-hemolysis for accurate and effective testing;

d.      failure to realize that the administration of antibiotics would destroy results from a culture draw if, in fact, cultures were drawn;

e.      failure to timely order urinalysis testing to check for the presence of red blood cells in decedent's urine

f.      failure to appreciate the reason for the presence of red blood cells in decedent's urine when urinalysis was finally ordered;

g.      failure to perform adequate assessments to include, but not be limited to, heart and cardiac examination;

h.      failure to recognize that "anchoring errors" occurred in diagnosis during multiple visits;

i.      failure to detect a heart murmur and list as a differential diagnosis given the decedent's long medical history of rheumatic valvular heart disease with murmur;

j.      failure to recognize the significance of an increase in decedent's inflammatory markers;

k.      failure to recognize the significance of continuing abnormal lab values as indicators of a still undiagnosed disease process;

l.      failure to apply EGDT ("Early Goal Directed Therapy") criteria and protocol;

m.      failure to interpret abnormal vital signs correctly and their significance;

n.      failure to timely inform the decedent and/or his family regarding the positive culture results;

o.      failure to incorporate decedent's preexisting condition of rheumatic valvular heart disease and accompanying murmur necessitated more substantial work ups and thorough physical examinations;

11

p.      failure to properly document;

q.      failure to properly and adequately review decedent's medical records to determine the genesis of decedent's infectious disease process;

r.      failure to recognize that decedent's dental procedure of August 22, 2013, was the genesis of decedent's infectious disease process and not related only to "...2 weeks smoldering fever/chills after a dental extraction..." documented on November 18, 2013, by Eric Ritchie, M.D.;

s.      failure to identify decedent as a high risk patient for infective endocarditis; and,

t.      negligently and carelessly failing to measure up to the requisite standards of care and skill recognized and observed in the field of medicine, and related fields, while performing care or engaged in caring for decedent, and in further particulars that at this time are not known to plaintiff as to the specific facts, but which are believed and hereby alleged will be disclosed during discovery in the course of the litigation.

45.     The negligent actions and omissions of the CHINLE staff for their failure to diagnose and treat decedent between October 4, 2013, through November 18, 2013, caused injury to, and decedent's subsequent death, were actions and omissions for which the United States would be liable to plaintiff for negligence under the laws of the State of Arizona, the place where the incident occurred, if the United States were a private individual at fault for the same negligence.

46.     At all times material hereto, decedent was a patient of the Indian Health Service, an agency of the United States Department of Health & Human Services, and was in the care and custody of CHINLE and involved staff, completely dependent upon the government, the hospital, and the hospital staff for his medical care.

47.     Defendant United States, acting through its employees, negligently failed to provide appropriate, reasonable, and required medical care to decedent which gives rise to a negligence cause of action against defendant, as laid out herein.

48.     As a direct and approximate result of the negligence of defendant United States and its employees, and the staff at CHINLE, decedent died.

## DAMAGES

49.     Under the FTCA and the law of the place of the wrong, the State of Arizona, plaintiffs are entitled to compensatory damages for their losses, both special and general, including damages for the nature and duration of decedent's pain and suffering, funeral and burial expenses, loss of the value of life, decedent's past medical expenses, non-medical expenses incurred by plaintiff, loss of value of household services, loss of companionship, love and affection,  and other losses of consortium. Defendant United States is liable to plaintiff for her losses and hereby claims a right to recover all allowable damages recognized by Arizona, whether specifically mentioned herein or not.

## CONCLUSION

**WHEREFORE,**  plaintiffs pray for the court to enter judgment for them, individually, and on behalf of the Estate of Timmy Teller, and to order that they be compensated for all losses allowed or recognized by law, for an award of allowable costs, and for such other relief as recognized under the laws and rules that govern this case.

Respectfully submitted

BARBER & BORG, LLC
P.O. Box 30745
Albuquerque, New Mexico  87190-0745
(505) 884-0004
(505) 884-0077
scott@barberborg.com

By:_____*/s/ Scott E. Borg*_____
Attorneys for the Plaintiff